Thank you, Your Honor. Good morning. May it please the Court, my name is Kevin Barasch. I represent Amalgamated Sugar Company. I want to thank the Court for letting me participate in the argument today. In this case, Amalgamated contends that USDA misinterpreted sections 359B, B2E, and F of the Agricultural Adjustment Act of 1938 and misapplied them in this case, and that if it had properly applied the law, it would have been required under the facts of this case to eliminate Pacific Northwest Company's sugar allocation and to redistribute that allocation fairly among all remaining participants instead of transferring it to a single company. We also contend that the District Court erred in granting Chevron deference in this case because USDA's interpretation of these statutes was inconsistent with both the plain language of the statute and with USDA's own regulations. Your Honor, the important facts of this case are that in February 2001, Pacific Northwest Company, which held the marketing allotment, ceased sugar beet processing operations altogether. It was $159 million in debt and had only been able to continue operations by securing a special $20 million loan from USDA. Six months after receiving that loan, it defaulted. Without any funds to continue, it ceased operations. After February 2001, Your Honors, Pacific Northwest never again processed a single pound of sugar. Of course, the real question we're going to have to deal with is what's the meaning of a sugar beet processor? I think it's also the meaning of the term permanently terminated operations, Your Honor. We believe that the facts that we're about to discuss before the Court show without a doubt that they permanently terminated operations within the meaning of subsection E, and that if the law had been properly interpreted and applied, that section would have prevailed and the court or the judgment, USDA would have been compelled to transfer the allocation. So what we have before us is not necessarily the ALJ ruling, which you admire and respect.  But the hearing officer who sets the standard for the department, and that hearing officer made a determination as to whether that organization was a sugar beet processor. We have to determine whether or not that was correct, and that might determine on whether the Chevron deference given to them in their determination or a definition of that term. Your Honor, the decision you're talking about was not a hearing officer. It's the judicial officer who was not at the hearing. I meant judicial officer. That officer did not hear any of the evidence. I understand. He's a single appellate judge. He's an appointee of the Secretary of Agriculture, Your Honor. Not a judge. No, Your Honor. Does a judicial officer find facts, or is a judicial officer bound by facts found by the underlying hearing? In this case, he found facts in his, but they were the same facts that had been found by the ALJ, Your Honor. There's no substantial difference between the findings of fact made by either of the officers. The only difference was the way they interpreted the law. The conclusions. But isn't the real question the one that Judge Wallace has talked about before? The problem is that the judicial officer did not adopt the same definition for processor as did the ALJ, but instead said that the processor would be anybody who had an allocation. Isn't that what he said? That's what he said, Your Honor. And that isn't what the ALJ said. The ALJ said that the processor had to agree with the regulations that the department had set out as what to be a sugar beet processor, correct? The ALJ said that, yes. No, Your Honor. The ALJ said that the language of the statutes themselves. I think that's really key here. Not the regulations as much as the language of the two statutes. If you look at the two statutes that are sequential. The ENF? ENF. They were passed at the same time. They should be read in parliamentary. It's Congress's way of solving a particular problem. So we don't have to go to the reg? Well, the reg, I think, Your Honor. Did the reg illuminate what the agency thought the statute said? Yes, it did, Your Honor. The CFRs, the Code of Federal Regulations. That's right, Your Honor. And we would like the court to pay attention to the regulation because we believe that. Because CFRs are promulgated in a very specific way. Yes, Your Honor, they are. This was promulgated through rulemaking. It's the kind of interpretation that Chevron deference is ordinarily given to. Go ahead. The facts of this case, we think, Your Honor, compel the conclusion that Pacific Northwest permanently terminated its operations and that USDA was then obliged under the plain language of the statute, subsection E, to take away that allocation and redistribute it. I already mentioned that after February 2001, PNC never again processed another pound of sugar. Let me just focus on one word so the other side can think about it too. Permanent termination of operations. Yes, Your Honor, that's right. As a process. That's right, Your Honor. And operations ceased February 2001, never began again. So really at that time, the only thing that they really owned that was any significance was the original allocation awarded. Well, Your Honor, they didn't own the allocation because no one can own an allocation. It's not an exception. I understand that. But own in the sense they've got something to sell that someone might want and did want and did get. But there was no processing that could go on. It wasn't only equipment already sold. The equipment was gone, Your Honor. It was lost in a default sale in May 2001 to a company called Central Leasing. Yes, the leasing company. That's right, Your Honor. And the ALJ was a little critical of what this was. What do you call it? A sham, Your Honor. Yes. Okay. Not only did they lose their ability to process sugar, they lost their plant, all their equipment, they lost their employees, and they lost all their grower contracts. They didn't have any sugar put through a factory, even if they had had a factory, Your Honor. So this was a shell company. And I think the most important document in this case, Your Honor, is at our excerpt of records, pages 307 and 308. And that is a declaration, a resolution of the board of directors that controlled this company. And it said that it had no desired interest or ability to move forward and operate the PSNSC processing facility, and it therefore transferred all possible rights to any current or future marketing allotment together with such production, construction, and operating history as may be necessary to obtain such allotment to the Washington Sugar Company. After that, Pacific Northwest ceased to exist. Now, Your Honor, there has been some contention made by the Council for American Crystal that there was never a transfer of assets from Washington Sugar, from PNSC to Washington Sugar. I asked the court to look at pages 309, 310, and 311 of our record, of the excerpts of record. This is a letter that was sent to Mr. Dan Palacicco, who is the director of the program at USDA, on July 30th. It was sent jointly by Mr. James Horvath, the president of American Crystal Company, and by Scott Liebert, the president of Washington Sugar Company. And I quote, As you know, PNSC currently holds a marketing allocation representing 2.7% of the Beats Sugar allotment. The allocation was based on PNSC's historical operation of the factory. PNSC has reached an agreement with the Washington Sugar Company, LLC, by which WSC has acquired substantially all the assets of PNSC, including PNSC's right to the allocation. Your Honor, I would submit that you would be hard put to look at that language and the language that's in the footnote and find those two compatible statements. There was clearly a transfer of all the remaining assets of Washington Sugar, including any right that they might be able to assert to the allocation to Washington Sugar as of July 30th. Therefore, Your Honors, there was nothing left of this company. For what happened in the meantime? Well, somehow, between the time... Right after this, by the way, Your Honors, AmeriCrystal Sugar and Mr. Leibert submitted an affidavit, which you can find at pages 306 to 308 of our excerpts of record. And in that affidavit, Mr. Leibert said, Here is a copy of the resolution of the Pacific Northwest Board of Directors. And this resolution shows that they've transferred all of their assets, remaining assets, to me, Washington Sugar Company. There's nothing left. So, at that time, there was a proposal, and if you look back again at the letter of July 30th, the proposal was not to buy assets or anything from Pacific Northwest. The proposal was to buy them from Washington Sugar and from Central Leasing, not from anybody who had been a sugar beet processor at any time. What happened in the meantime? Well, somewhere between then and there, the deal changed. Somebody encouraged them that perhaps this wasn't anything that was compatible with the statute of the regulations and encouraged them to somehow resurrect and bring Lazarus out of the grave. So sometime between that time and September 8th, suddenly Pacific Northwest reappeared on the scene, and there was a transaction put together which pretended that PNSC had really existed all that time and hadn't been dissolved by its board of directors, hadn't lost all of its assets. And that's the sham that this judge was talking about. Now, the record establishes very clearly, we believe, that PNSC ceased operations. And if there's any questions about that, you can look at the admissions of the parties. They all agreed. They ceased their operations, processing operations, in February 2003. And that it was permanent. And that's clear from the record. That's clear from the statements of the board of directors in the resolution of December 3rd. It's clear from the statements of American Crystal's president, Mr. Horvath, in his letter of July 30th. If he wasn't telling the truth at that time, then he was making a misrepresentation to the government. In E, there's a parentheses that follows permanently terminated operations. Parentheses. Other than in conjunction with a sale or other disposition of the processor or the assets of the processor. What does that mean? Does that somehow give the other side latitude to squeeze into the parentheses? Not at all, Your Honor. What Congress intended here, Your Honor, was two different situations. In subsection E, Congress said if a company that currently has an allocation goes out of business in any way, goes into bankruptcy, is dissolved or otherwise permanently terminated operations, then you have to take away that allocation. And reallocate it. And reallocate it. However, they said if you are a live and viable operation, you're a real processor and you sell all of your assets to another company, then there can be a transfer. But you've got to be a real company, Your Honor. You have to have real assets. You can't come up with this kind of shell game that's been perpetrated in this case. So in a way, you're arguing that the parentheses simply foreshadows F. Yes, Your Honor. That's right. I'd like to reserve a few minutes, Your Honor. Thank you. Thank you. May it please the Court. I am Jeffrey Kahn. I am representing the Department of Agriculture in this case. Of our 15 minutes, we would like to use 10 and let the intervener, Mr. Bundy, representing American Crystal, use 5 minutes. Let me start with the first couple of minutes then. As you know, ESA's permanent termination of operations of a processor. So my mind immediately wants to know what processor is. So I go to the Code of Federal Regulations. I go to Code of Federal Regulations, Title VII, Ag, Sub B, Department of Ag, 14, Commodity Credit Corp., Sub Chapter B, Loans, Sugar Program, General Provisions. And the first thing it says under definitions is, the definitions set forth in this section are applicable for all purposes of program administration. All purposes of program administration. I then turn over and I find that there's a definition of processor that takes me back to E, and that says, processor means a person who commercially produces sugar directly or indirectly from sugar beets, including molasses, has a viable processing facility, supply of sugar beets for the applicable allotment year. There's nothing about an allocation continuing you as a processor, even though you've permanently terminated operations. So why doesn't the Code of Federal Regulations tell us already what your interpretation of E is? And here we have an organization that's permanently terminated operations. Where am I off track? The definition in the CFR of sugar processor, Your Honor, establishes that what a sugar processor is for the allotment year. In this case, under the statute and the body of the regulation, Congress established that the processor would be a sugar processor if it had production during 1998, 1999, and 2000 years. I have a hard time following that. The government argues that it's the same thing. Well, if the other side is right, then it shouldn't have made the allocation because the allocations are required to have been made based on prior years. But it seems to me that assumes that there's something going on. I mean, what that argument says is you make an allocation even to something that's completely out of business. I mean, that doesn't fall within the purpose of this program at all. You make an allocation to something that no longer exists. If the reason for the rule no longer exists, why follow the rule? The statute required the Department to make the allocation. At the time Congress enacted the statute in May of 2002, Pacific Northwest was not processing sugar. Right. As of October 1st, when the Department made the permit allocation, it was not processing sugar. Once the statute mandated that the allocation be made. Even though there's no processor, according to your own definition. It says for all program purposes. Well, they were a processor, Your Honor. How, if they're no longer operating? I mean, the definition is here. The explanation is in E itself. And so you're asking almost for a ridiculous idle act. You have to make an allegation to something that no longer exists. I mean, this is a little Alice in Wonderland. First the verdict, then the trial. I mean, are you a processor so you get an allocation? Or because you have an allegation, you are a processor even though you're not. Pacific Northwest continued to represent to the government that it was going to process sugar. How could it do that? Out of business. It was not out of business, Your Honor. If I understand your argument, at one time Northwest was a processor because it got a process. It hadn't been doing it, but it got it. So that is a little something or other, a right that continues on regardless of whether they ever process a sugar bean. And there's no time limitation. So that 50 years from now, you have a rusted out factory. They could still sell whatever equipment there is left that hasn't been hijacked or sold or whatever. And there'd still be a valid allotment. If that's the interpretation, it's a strange one to me. Is that really what we're saying? No, that is not the government's interpretation, Your Honor. Tell me how it stops. The government was required to make the allocation. Once it made the allocation, it had authority under another provision to make a reassignment of the allocation for that crop year. Under any circumstance? Yes, Your Honor. An interpreting processor in two different ways in order to make it happen. Because you've got a processor under the statute, which is defined as one who's processing. And then the officer in the department says it's just somebody who got an allocation last year. But if I use somebody who got an allocation last year as a processor in your regulations, it doesn't fit only in this one circumstance for this one time. Well, Your Honor, we would offer that Pacific Northwest was not a processor for the purpose of subparagraph F, and it also would not have been a processor for the purpose of subparagraph B. Here you have the paragraphs referring to each other, and the government is offering a consistent interpretation of the processor. Here's my question. Why did the government condition the approval of the transfer to American Crystal? Because Pacific retained its allocation, and it transferred all of its assets. Well, frankly, American Crystal had to agree to drop their appeal of the increase in allocation from the last year in order to get this to happen, didn't they? That was one of the requirements, yes. And then after that, the USDA conditioned the approval of the transfer on a waiver by American Crystal and Pacific of any rights to bring an action against USDA in the event that USDA was required by a court to reverse the transfer. Isn't that true? Yes, it is, Your Honor. And isn't it also true that USDA had an interest in not finding that Pacific had permanently terminated their operations? Because they had a $20 million loan out there, and it hadn't been paid down, and the only way they were going to get any money for the $20 million was to backdate from the sugar company the transfer back to Pacific so that they could transfer this allocation or they wouldn't get the pay down. Seems like a pretty good deal for USDA then to not do what they had to do under their own regulation because then they get some money where they wouldn't have got any before, and which is exactly what the poor ALJ said was a sham. And this may be a reason to take another look at Chevron deference. Isn't that what happened? The J.O. found that based on the administrative record that Pacific retained its allocation. The district court agreed with that. Well, but address the facts. What fact have I asked you that did not happen? And here I am supposed to suggest that. Now I have to give deference to this guy who's sitting there next to the secretary and making this decision and making money on the decision when his regulations don't talk about that at all. They talk about a processor who really processes stuff, not just keeping an allocation, which isn't even an asset, and transferring it on so that the government can make some money. When it's Congress's intent, as I understand it, that this distribution be distributed equitably to everybody if you're not going to make sugar. This was the first year of operation of this program, The department, when it made the allocation to Pacific Northwest, distributed almost the entire allocation at that time. This amalgamated was the primary beneficiary of this. It received almost half of it. No other processors at that time challenged this. They had a right to challenge it under the statute. They thought that Pacific Northwest was a processor. The president of Amalgamated discusses how the processors calculated what their allocation was going to be. They all contemplated that Pacific Northwest was going to receive an allocation at that time. Have the rules changed? Would this be treated differently now if it started tomorrow than it was treated back then? The regulation at the time, Your Honor, was silent. The department amended the regulation in 2004 and said if a processor advised that it had permanently terminated operations or that it had ceased operating for two consecutive years, that the department would eliminate and transfer the allocation. So if it started now, it would go the other way? No, it would not, Your Honor. It would come out the same. My ten minutes is up. I'd like to give American Crystal the opportunity to address the point. You can answer the question. It would not go the other way, Your Honor. Two consecutive years had not passed since the time that American Crystal was requested. So it's the two consecutive years that's the problem. Right. Everyone concedes that they ceased processing in February of 2001. However, a sugar processor does not operate for the entire calendar year. They operate for a certain number of months after the harvest. So applying that two-year rule, the department would not have found that Pacific had permanently terminated operations. Thank you. If it pleases the Court, my name is David Bundy. I represent American Crystal Sugar. I hear the Court's questions, and I think that where we differ with the implication of some of the Court's questions is the interpretation of the USDA of that initial statute. Now, our interpretation, and obviously the USDA's interpretation, is that if you were a processor in 1998 to 2000, and Pacific clearly was. They met all the regulations. They met any definition of processor that you can imagine. They made sugar. They had a factory, the whole nine yards. If you were a processor during that time period, then we read the statute, and the government does too, to say that you are entitled to get your initial allocation beginning October of 2002 when this program took place. What's the point of that, though? I mean, if I'm a sugar beet processor, I have a factory, and I'm gone. I'm up in smoke. I'm history. You're telling me, nevertheless, the government is required to make an allocation to a nonexisting entity. Is that what you're saying? I disagree with the premise, Your Honor, that they are nonexistent. Hypothetically, let's talk about it. It's a nonexistent operation. We're gone. What you're arguing is that, nevertheless, the statute requires an allocation to that kind of an operation. Is that right? If, in fact, there was no hope whatsoever, if this was a patient that was completely dead, I can see an argument under your hypothetical. But isn't that exactly what you argued on June the 16th of 2003 when Columbia Sugar Company wanted an increased market allocation, and the request was denied, and American Crystal went in and testified. Pacific was dissolved. They terminated their operations. They're unlikely to resume operations. Wasn't that your argument? Unlikely is the key there, Your Honor. What I read, dissolved, terminated operations. The only unlikely was the unlikely to resume. That's the key. Gone but not likely to come out like a phoenix from the ashes. Well, Your Honor, but remember, the statute says you only lose your allocation if you permanently terminate, and that's the issue that I think hasn't been talked about yet because the question the USDA was struggling with, and the whole industry was, had they permanently terminated? I liken this, if you will. Don't forget the word operations. Correct. Does having an allocation put them under operations? They certainly had not operated in the sense of processing sugar. What did you buy? Had they permanently terminated? What did you buy? What did we buy? Excellent question. What did you buy? We bought everything. Now, I did mention. We bought everything. What was everything? Everything I grant, that the assets that Pacific had left were largely intangible assets, but not completely. There were things like non-competes. There were releases from the growers, things like that, that are often bought and sold in a commercial. Those are intangibles. Correct. So the best thing you can say you bought was Goodwill and a couple of non-compete agreements, and that was a buying of their operation? No. It doesn't say their operation. It says all their assets, Your Honor. So they can. So under your interpretation of the statute, they can sell off everything that it takes to manufacture sugar, everything that it has, and as long as the USDA will continue to give them an allocation, which is what you want, and they have a couple of intangibles, you can have it and get the allocation. Good question. That's not what happened here, Your Honor. The USDA required us to buy everything they had, of course, but the USDA didn't just rubber stamp this thing. The USDA affirmatively said to us, you also got to go out there and pay over $2 million to Central Leasing to buy the assets that they used to have, and those were the assets, including rights to the factory and a bunch of equipment and all kinds of things, that were used to produce sugar. But USDA directed you to do that?  We came in with one proposed transaction, Your Honor. Let me ask you a question. Excuse me. Going back to deference. We allow government deference because we sort of think the government's okay and they're fair and they'll make the right decision. Now, set aside that it's not the government. It's just the decision maker. Would we ever, in a situation where the so-called decision maker has directed how the matter is to come out, has $20 million that it's going to gain from it, would we ever allow that decision maker to be the untouched neutral? Would we? Your Honor, none of the evidence in the record speaks to any of this $20 million gain or anything like that. That's really not an issue before the ALJ or any of the lower courts. I'm just asking the question of why we should give Chevron deference in a situation such as this where the person to whom we're giving the deference, the department, has been directly involved in the process. They must have thought it's right or they wouldn't have gotten into it and have a very substantial outcome that's going to occur. Why should we give Chevron deference in a situation like that? Aren't there limitations? Certainly. If there's a reasonable basis, two things, Your Honor. If there's a reasonable basis for the USDA's handling of this situation, then absolutely Chevron deference is warranted. And here it was because, as I was mentioning before, they temporarily had stopped ceasing production of sugar, but had they permanently stopped? And there's a whole lot of things we argued in our brief that they still had a pulse. That's a different question. I'm just worried about the Chevron deference because, in my judgment, a lot of this case is determined by whether or not we give that kind of deference to the Department of Agriculture to approve this process. I'm not aware, Your Honor, of anything in the record or in the J.O. or the ALJ's decisions or any of the lower court's findings that talks about that financial incentive that you're referring to. And I think that's really not in the record, and I think that's speculation too. Well, I wouldn't get it if it isn't in the record because I can't leave outside the record. There may have been some reference and argument, but that was not a basis of even the ALJ's decision. Thank you for your argument. Thank you, Your Honor. Sorry, did I interrupt you? No. Your Honor, I'd just like to comment about your question to Mr. Kahn as to whether the regulations that were applied today would cause a different result. And the answer is yes, it would, Your Honor. Regulations that were enacted say two consecutive years. They do not say two crop years. If you look at the regulations all through that same regulation, when USDA wanted to say crop year, they said crop year. This does not say crop year. It says consecutive years, and that must be given its ordinary meaning under ordinary rules of construction, in particular where crop year is used in other place. So Mr. Kahn is wrong. You could not possibly apply crop year because of the way the regulation is written. It would be two consecutive years. Two consecutive years after these ceased operations would have been February 2003, six months before this transaction occurred. I was going to point out also, Your Honors, that what was left, what was really being bought here by American Crystal was the allocation. There wasn't anything else. They were trying to buy an allocation. And, Your Honors, an allocation cannot be bought. The government would concede this. An allocation is a right in the nature of a license. The only kind of transfer that can occur is at the behest of the Secretary of Agriculture. He can transfer. He can take away. He can temporarily reassign. No one else can do that. So it's not an asset that can be bought and sold. And yet, you'll notice in the judicial officer's opinion, he wrongly found as a fact that American Crystal bought the allocation for $6 million. This is the kind of confusion. This is the kind of opinion we have out of the judicial officer here. And I would say, I would offer to Your Honors that this is the kind of opinion that is not entitled to any definition in this court. Thank you. Thank you very much. Case 07353, or excuse me, 35971, Amalgamated Sugar v. Schaefer, and the department, or excuse me, and American Crystal Sugar Company is now submitted. Thank you very much. Thank you very much, counsel, for your argument. All rise.
judges: Wallace, Trott, Smith